J-S35037-22, J-S35038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.M.R. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.A.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 670 MDA 2022 |

Appeal from the Order Entered March 31, 2022
In the Court of Common Pleas of Adams County Orphans' Court at No(s):
RT-12-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.A.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 689 MDA 2022 |

Appeal from the Order Entered April 1, 2022
In the Court of Common Pleas of Adams County Juvenile Division at
No(s): CP-01-DP-0000041-2020

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:              **FILED: OCTOBER 25, 2022**

A.A.R. ("Mother") appeals from the orders entered in the Court of Common Pleas of Adams County, which involuntarily terminated Mother's parental rights to her daughter, M.M.R. ("the Child"), born in October of 2017,

---

[*] Former Justice specially assigned to the Superior Court.

pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b), and changed the Child's permanency goal to adoption, pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351(f).[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: Shortly after the Child's birth, while the Child was living with Father and Mother, the Child was the victim of suspected poisoning after sleeping pills were found mixed with her baby formula. Mother was not charged in connection with this incident,[2] and she moved with the Child to a domestic violence shelter.

Thereafter, in May of 2020, the Adams County Office of Children and Youth Services ("the Agency") received a referral regarding concerns about Mother's mental health and the condition of her home. Mother initially cooperated with the Agency's recommendations, and thus, the Agency closed the case on July 15, 2020.

However, the Agency received an additional referral regarding concerns about Mother's mental health and the poor condition of her home. On August 5, 2020, the Agency responded to Mother's home and discovered dirty diapers, old food, toys, and trash on the floor. The home smelled of mildew and contained bugs. The Agency gave Mother time to clean the home, but she

---

[1] The Orphans' Court's order also involuntarily terminated the parental rights of T.E.R. ("Father"). However, Father is neither a party to this appeal nor has he filed a separate appeal.

[2] Father was charged with child endangerment. Orphans' Court Opinion, filed 3/31/22, at 1.

was unable to do so. Father, who has a long history of substance abuse, had no ongoing contact with the Child at this point. On August 6, 2020, Mother posted threats of suicide on social media.

Based on the aforementioned, including Mother's mental health concerns and the deplorable conditions of the home, the Agency filed a dependency petition on August 17, 2020, on the basis the Child was without proper care or control. The Agency requested the Child be found a dependent child and placed in the custody of the Agency.

By order entered on August 21, 2020, the Juvenile Court found sufficient evidence that the return of the Child to the home of Mother was not in the Child's best interest and would be contrary to her welfare. Thus, the Court transferred legal and physical custody of the Child to the Agency, and the Child was placed in foster care with D.A. and her family. The Court appointed David K. James, III, Esquire, as the guardian *ad litem* for the Child. The Court also appointed attorneys to represent Mother and Father.

Following a dependency hearing, by order entered on September 28, 2020, the Juvenile Court found by clear and convincing evidence that the Child was without proper care or control, subsistence, education, or other care or control necessary for her physical, mental, or emotional heath. Thus, the Court found the Child to be a dependent child. The Court set the goal as return to parent and set various objectives for Mother, including maintaining a clean home, cooperating with the Agency, participating in a parenting skills

program, submitting to drug and alcohol screening, and addressing her mental health concerns.

On November 18, 2020, the Agency filed a motion for a permanency review hearing on the basis the Child continued to be without proper care or control, subsistence, education, or other care or control necessary for her physical, mental, or emotional heath. By order entered on December 4, 2020, the Court determined Mother had shown minimal progress toward alleviating the circumstances which necessitated the original placement of the Child. Thus, the Court determined the Child was a dependent child; however, the Court set the goal as return to parent.

Following additional permanency review hearings, by orders entered on March 22, 2021, June 7, 2021, August 3, 2021, and November 9, 2021, the Juvenile Court concluded Mother had been minimally or moderately compliant with her goals, and thus, the Court determined the Child was a dependent child. The Court changed the goal to return to parent with a concurrent plan of adoption.

On December 15, 2021, the Agency filed a motion to suspend contact between Mother and the Child. The Agency averred it had received a recommendation from the Child's therapist indicating that any further contact with Mother posed a grave risk to the Child. On December 15, 2021, the Court filed an order suspending contact between Mother and the Child pending a hearing, and, following a hearing, the Court held all contact between Mother

and the Child, including supervised visitation, would cease as visitation was not in the Child's best interests.

On December 17, 2021, the Agency filed a petition for a hearing to change the court-ordered goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6365, as well as to involuntarily terminate the parental rights of Mother under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

By order entered on December 28, 2021, the Orphans' Court held that the Child's guardian *ad litem,* Attorney James, would represent the Child as legal counsel for the termination proceedings.[3] The Orphans' Court also appointed separate attorneys for Mother and Father.

The matter proceeded to a hearing on March 3, 2022, at which Dr. JoAnn MacGregor, a clinical and forensic psychologist, testified. Dr. MacGregor

---

[3] Our Supreme Court has instructed this Court to verify *sua sponte* that the court appointed counsel to represent a child pursuant to 23 Pa.C.S.A. § 2313(a), and if counsel served in a dual role, that the court determined before appointment that there was no conflict between a child's best and legal interests. *See In re Adoption of K.M.G.*, ___ Pa. ___, 240 A.3d 1218 (2020). If a child is "too young to be able to express a preference as to the outcome of the proceedings," there is no conflict between a child's legal and best interests, and the child's Subsection 2313(a) right to counsel is satisfied by an attorney-guardian *ad litem* ("GAL") who represents the attorney-GAL's view of the child's best interests. *See In re T.S.*, 648 Pa. 236, 192 A.3d 1080, 192-92 (2018). Here, the Child was just over four years old, and we conclude her statutory right to counsel was satisfied by Attorney James. We note Attorney James indicated there was no conflict between the Child's best and legal interests, and he subsequently argued to the court in favor of termination.

testified she evaluated Mother on December 4, 2020, and at the time of the evaluation, Mother was "emotionally erratic and psychologically unstable." N.T., 3/3/22, at 16. Dr. MacGregor determined substance abuse may have been contributing to Mother's behavior; however, "it [was] also reasonable that her full range of erratic symptoms [were] accounted for by bipolar disorder, borderline personality disorder, and post-traumatic stress disorder." *Id.* Dr. MacGregor noted Mother's medical records revealed she had previously been diagnosed with these conditions. *Id.*

Dr. MacGregor opined that, until Mother becomes psychologically stable, she will not have the capacity to adequately parent. *Id.* at 19. She concluded that, to become psychologically stable, Mother would need to take her prescribed medicine regularly; however, Mother has not shown the ability to do this. *Id.* at 19-20. Moreover, Mother needs consistent trauma counseling to reach a point of psychological stability. *Id.* at 20. Dr. MacGregor opined Mother does not meet the minimally adequate criteria "for safe parenting." *Id.* at 23. Thus, the Child would not be safe if she is returned to Mother's care. *Id.*

Dr. MacGregor testified there is "no period of time in which [Mother has been] able to demonstrate or describe stable lifestyle functioning." *Id.* at 27. Dr. MacGregor indicated that, since Mother does not have the personal stability to manage her own emotions, she will most certainly not have the

ability to respond to the Child's emotional needs. *Id.* at 32. If the Child's emotional needs are not met, she will "become traumatized." *Id.*

Dr. MacGregor opined Mother has difficulty bonding with the Child. *Id.* She noted Mother has attachment issues from her own childhood, and with her depression, post-traumatic stress disorder issues, and personality issues, it is difficult for Mother to be motivated to interact with the Child. *Id.* at 21. She notes Mother has a tendency to blame others for her own behavior, which interferes with her ability to maintain a relationship with a mental health provider. *Id.* at 22.

Agency caseworker Elizabeth Winebrenner testified she was assigned as the initial caseworker for this matter in May of 2020. *Id.* at 35. The Agency received a referral due to the poor conditions of Mother's home, as well as concerns about Mother's mental health. *Id.* Ms. Winebrenner went to Mother's home several times and informed her she needed to clean the house to make it safe for the Child. *Id.* at 36. Mother enlisted people to help clean the house, and she began working with a therapist, so the Agency closed the case. *Id.* at 36-37.

However, a week later, the Agency learned Mother was not following through with mental health services, and the condition of the home was again poor. *Id.* at 37. In an unannounced visit on August 5, 2020, Ms. Winebrenner discovered old food, trash, bugs, dirty diapers, and large piles of clothes strewn around the home. *Id.* at 38. Both the toilet and bathtub were filled

with dirty, brown water. *Id.* The Agency enlisted the Justice Works Youth Care/Stop Program ("Justice Works") to help Mother clean the home on that day; however, the program workers reported Mother was unable to help them because she "didn't have the energy." *Id.* at 40. At this point, the Child was removed from Mother's home and, with the agreement of Mother, placed in the home of D.A., who Mother knew from church. *Id.*

Ms. Winebrenner contacted Father, who was not consistently involved with the Child, to report the Child had been removed from Mother's care. *Id.* at 41. Ms. Winebrenner traveled to Father's home in Waynesboro, Pennsylvania, and when Father met her on his porch at 11:00 a.m., "he smelled like alcohol." *Id.* Since Father had a history of substance abuse, Ms. Winebrenner informed him that he needed to submit to a drug test before the Agency could consider placing the Child with him. *Id.* Father told her to get the f--- out of his house. *Id.*

Ms. Winebrenner testified that subsequently, on August 20, 2020, Mother was admitted to the hospital for concerns with her physical health, and she made statements indicating she was going to take the Child and flee the state. *Id.* at 43. Mother sent threatening text messages to D.A. and Ms. Winebrenner, and Mother was eventually involuntarily committed for mental health concerns due to threats of self-harm. *Id* at 44. The Agency then took protective custody of the Child and placed her with D.A. and her family. *Id.*

Ms. Winebrenner testified that, after the Child was adjudicated dependent, Mother was given various goals, including to clean the house. *Id.* However, despite the Agency arranging for programs to assist her, Mother was unable to make any progress in keeping the home clean. *Id.* at 46. Ms. Winebrenner testified Mother's physical and mental health conditions interfered with her ability to maintain any type of cleanliness in the home. *Id.*

Breanna Neidlinger, a parent educator with Justice Works, testified she provided services to Mother, including giving her assistance with transportation and helping her with nurturing lessons. *Id.* at 58. She noted Mother expressed frustration with the Child being out of her care, and she made negative comments about Ms. Winebrenner. *Id.* at 63.

Ms. Neidlinger noted Mother did not address her mental health issues, and there were concerns that she was not engaging with the Child during visits. *Id.* at 64. When the issues were brought up to Mother during team meetings, Mother became hostile and, in one meeting, she said Ms. Winebrenner is "a psychopath who just takes children for a living." *Id.*

Ms. Neidlinger testified Mother had difficulty consoling the Child and transitioning to different activities with her during visits. *Id.* at 66. She testified "there was just a general lack of engagement or bonding between" Mother and the Child. *Id.* at 68. Ms. Neidlinger noted suggestions were made for Mother to get on the floor to play and interact with the Child during visits; however, instead, Mother remained on the couch. *Id.* Ms. Neidlinger testified

there was not much progress as it related to Mother implementing the nurturing techniques she had learned. *Id.* at 71. She clarified that Mother gained a lot of knowledge about how to nurture a child, but there was a disconnect with Mother being able to use her knowledge to nurture the Child. *Id.* She noted Justice Works stopped providing services on July 29, 2021.

Evelyn Watts, an outpatient mental health therapist at TrueNorth Wellness Services ("TrueNorth"), testified she has provided mental health treatment to Mother since August 6, 2021. *Id.* at 84. Prior thereto, since the spring of 2020, Mother received therapy from a different therapist at TrueNorth; however, that therapist left the practice. *Id.* at 85.

Ms. Watts testified Mother was to attend sessions with her bi-weekly; however, Mother was inconsistent with her attendance. *Id.* at 86. Mother also had inconsistent attendance when she was working with the other therapist at TrueNorth. *Id.* Ms. Watts testified that, since Mother has been receiving treatment from her, she has made significant personal progress, but she had "maladjustment issues" with interpersonal relationships, including as it pertains to the Agency and the court system. *Id.* at 89. Ms. Watts testified Mother will benefit from ongoing mental health individual therapy. *Id.* at 92.

D.A. testified she was a volunteer at a church, and she became acquainted with Mother and the Child in May of 2020 when Mother asked her to care for the Child while she was in the hospital. *Id.* at 106. Subsequently, in August of 2020, D.A. read suicide threats Mother had made on social media,

so she went to check on Mother. *Id.* The Child then began to live with her on August 5, 2020, and she was placed with her through foster care on August 20, 2020. *Id.* at 105-06.

D.A. noted when the Child began to live with her, she did not seem to have "the proper gross motor skills[.]" *Id.* at 109. In September of 2020, a pediatrician agreed. *Id.* D.A. placed the Child in a tumbling program to help with her motor skill development, and she is now in tap and preschool ballet classes. *Id.* at 109, 112.

D.A. testified that, when the Child first came to live with her, most of the clothes provided by Mother were significantly too small. *Id.* She noted the Child had been wearing shoes so small that they had "dug into her foot." *Id.* at 111. D.A. testified the Child is doing great in her care, and the Child gets along with D.A.'s nine-year-old daughter. *Id.* She noted the Child refers to her as "mommy" and her husband, Joseph, as "daddy." *Id.* at 113.

D.A. noted that, in December of 2020, in person visits between Mother and the Child stopped because of the Covid-19 pandemic, and when they began again, the Child exhibited tantrums and pulled her hair out. *Id.* at 115. She noted the Child, who was potty-trained, began having daytime accidents after visits with Mother. *Id.* After the visits ceased, the Child stopped exhibiting the behaviors, except for a few instances when Mother's name was mentioned. *Id.* at 116.

D.A. testified that Mother has been abusive to her in text messages, and she posted on social media that D.A. was trying to steal the Child. *Id.* at 119. D.A. testified Mother sent her text messages indicating she was going to sue her and press charges. *Id.* She noted she tried to encourage a relationship between Mother and the Child, but it was difficult for the young Child to communicate on the telephone and Mother was becoming increasingly aggressive toward D.A. *Id.* at 118-121.

Amanda Evans-Freet, a trauma art therapist for the Adams County Children's Advocacy Center, testified she began treating the Child in November of 2021, and she continues to do so in person on a weekly basis. *Id.* at 138, 143. She explained that art therapy is a "modality where children don't have to necessarily use verbal statements to express their thoughts, feelings and what they've experienced. They do that through art[.]" *Id.* at 134. She noted children use markers, crayons, colored pencils, and Model Magic, which is a type of Play-Doh. *Id.*

Ms. Evans-Freet testified that, in the beginning, the Child's play was very chaotic, she had poor body boundaries, and she showed no "stranger danger intuition." *Id.* at 136. She noted the Child exhibited hyper-vigilance, meaning she was "startled by small noises or any motion that would be outside." *Id.* The Child exhibited sexualized behavior, such as grabbing her crotch, when Mother's name was mentioned, and she would become fixated on needing the bathroom. *Id.* at 138. Based on the therapy, she determined

that the Child's troubling issues were related to Mother and the time the Child had been in her care. *Id.* at 137. As a result, Ms. Evans-Freet recommended that the Child remain in therapy and have no contact with Mother. *Id.*

Ms. Evans-Freet noted D.A. has been receptive to her suggestions regarding how to help the Child. *Id.* at 140. She testified she has no concerns regarding D.A.'s care of the Child. *Id.* Ms. Evans-Freet testified the Child demonstrates negative behaviors when Mother is discussed; however, she exhibits positive behaviors when the foster family is discussed. *Id.*

Ms. Evans-Freet testified there would be no negative effect on the Child if Mother's parental rights were terminated; however, it would negatively affect the Child if she were removed from the foster family's home. *Id.* at 142. She testified it would be positive for the Child if the foster family were to adopt her, particularly since the Child has demonstrated that she feels safe in the home. *Id.* Ms. Evans-Freet testified that she recommends the therapy continues, and she is in support of no contact between Mother and the Child. *Id.* at 144.

Caroline Brehm, a visitation specialist with the Agency, testified that she was tasked with supervising visits between Mother and the Child. *Id.* at 153. She noted Father never attended any of the scheduled visits. *Id.* Since August of 2020, seventy-six visits were offered to Mother, and Mother canceled eight of the visits. *Id.* at 158. She noted that, during the visits Mother attended, Mother was often preoccupied with her phone even after the

Agency asked her to refrain from using it during visits. *Id.* at 160-61. Ms. Brehm testified Mother was not regularly prepared for the visits in that she did not bring games or activities to play with the Child. *Id.* at 162. She testified Mother was offered to use bubbles and chalk outside with the Child, but she rarely did so. *Id.*

Ms. Brehm testified that, in the beginning, the Child seemed happy to see Mother, but there "wasn't like a nurturing greeting." *Id.* She testified the Child and Mother did not hug, kiss, or say "I love you" to each other; but rather, they simply acknowledged each other and then they would go to the visit room or outside. *Id.* Ms. Brehm testified Mother did not engage the Child. In the visit room, Mother sat on the couch, and she would not get on the floor to play with the Child. *Id.* at 164. When they went to the park, Mother sat at the picnic table but did not interact with the Child. *Id.* at 163. Also, prior to the Child being potty-trained, Mother was asked to bring diapers and items to the visits, but she failed to do so. *Id.* at 165.

Ms. Brehm testified that, at various times, when the Child would need something, she would leave the visit room where Mother was sitting and go next door to the observation room to get what she needed from the Agency workers. *Id.* at 169. She testified this was "uncommon" behavior since parents generally want their children to remain in the room with them during visits. *Id.*

James Starckey, a social service assistant for Adams County, testified he is involved with supervising visitations. *Id.* at 179. He noted he supervised twenty-four of the visits between Mother and the Child from 2020 to 2021. *Id.* He testified his biggest concern was Mother showed "low energy at the visits, not willing to go outside no matter the weather. Mostly she like[d] to sit and read books to [the Child], but she's not really looking to go outside and play in different activities." *Id.* at 181. He noted Mother had to be assisted by a caseworker to put a pull-up on the Child, and she did not bring activities or toys to engage the Child. *Id.*

Mr. Starckey testified Mother was often on her cell phone, and he later learned that Mother was sometimes texting the Agency to complain about different issues during the visits. *Id.* at 182. He testified Mother and the Child did not hug when they greeted each other at the beginning of the visits; however, they hugged as they were departing the visits. *Id.* Mr. Starckey testified the Child would climb on Mother in an attempt to be playful, but Mother remained "really low-key about it." *Id.* at 183. He noted the Child began to parrot Mother's excuses about why it was best to not go outside, such as when it was sunny, she said it would be too hot or when it was cloudy, she said it was going to rain. *Id.* However, he noted he observed the Child crying when she realized the other kids were going outside to play while she had to remain inside with Mother. *Id.*

Jessica March, a family support caseworker at the Agency, testified it is her job to help families alleviate the reasons that led to children being placed in the Agency's care. *Id.* at 185. In the instant case, she took over as the caseworker on September 14, 2020, and she developed a child permanency plan because the Child was placed at a young age. *Id.* She noted the Agency sent mail to Father; however, he never reached out to Ms. March, and to her knowledge, he has had no contact with the Child. *Id.*

Ms. March testified plans were made for Mother on September 18, 2020, March 18, 2021, and September 17, 2021, which provided for similar goals. *Id.* at 190. Specifically, Mother was given the goal of ensuring the Child's basic needs are met, including "housing, food, and clothing." *Id.* Regarding Mother's progress as to this goal, Ms. March testified:

> Gaining access to [Mother's] home was quite difficult throughout the life of the case. We had thirteen attempted home visits which were all unsuccessful. We only had eight home visits where we were allowed to stop by her house and seven where we were allowed to actually enter her house. On three of those occasions, the house was observed to be having many environmental concerns, which included bugs in the residence, trash all over the floor. There was a foul odor in the air, and there was just—it was very cluttered.
>
> ***
>
> [This was the condition of the home] on September 21, 2020,…December 2, 2020[,] and then July 22, [20]21.

*Id.* at 193-94.

Ms. March noted that, after July 22, 2021, the Agency was unable to gain access to the home. *Id.* She noted the court ordered the Agency to

inspect the home in August of 2021, and although the Agency made two or three attempts, the Agency was unsuccessful in gaining access. *Id.* Similarly, the court ordered the Agency to inspect the home in November of 2021, and the Agency was unsuccessful in gaining access. *Id.* Ms. March attempted to gain entry in January of 2022, but she was unsuccessful. *Id.*

Ms. March testified Mother was also given the goal of "ensuring that [the Child's] medical and developmental needs are met[,]" including ensuring the Child completes an Early Intervention evaluation. *Id.* The Child had an Early Intervention evaluation on December 10, 2020. *Id.*

Mother was given the goal of ensuring safe reunification with the Child, including "actively participating in a parenting skills program and obtain skills during visitation with [the Child.]" *Id.* at 191. Mother's compliance with this goal was "minimal." *Id.* at 198. Ms. March explained that Mother "showed no transference of learned material in observed visitations." *Id.* For example, Mother had difficulty knowing how to put a pull-up on the Child.

Ms. March noted Mother's primary problems were a lack of engagement, a flat affect towards the Child, and overuse of her telephone. *Id.* at 199. Ms. March testified Mother "would sit on the phone for 30 minutes at a time Face Timing others so she didn't have to engage with the Child[.]" *Id.* Ms. March testified Mother showed inappropriate parenting skills during a particular visit when she became aggressive towards the Child after the Child stated her foster mother was mad at Mother. *Id.* at 200. Mother would sit and color by

herself, and on one occasion, she built a gingerbread house by herself while the Child appeared to be disinterested. *Id.* at 213. Ms. March testified that, near the end of the life of the case, just before the no contact order was put into place, she began to notice a change in the Child's demeanor when the Child appeared for visits with Mother. *Id.* at 201. She specifically testified the Child was usually "very bubbly," but on visitation days she would "cling" to Ms. March and "shutdown in a sense." *Id.* at 202.

Mother was also given the goal of completing a parental psychological evaluation with MacGregor Behavioral Health. *Id.* at 191. She completed this goal; however, Mother's progress regarding following the recommendations from the evaluation was "minimal." *Id.* at 195. Ms. March explained Mother does not recognize the severity of her mental health issues, and her progress in addressing her mental health issues is "poor." *Id.* at 209. Ms. March noted the Agency had some concerns regarding Mother using Ms. Watts as a therapist. Specifically, she indicated Ms. Watts "was not practicing DBT, which was the recommendation by JoAnn MacGregor." *Id.* at 196. Ms. March noted Mother's attendance at the bi-weekly meetings with Ms. Watts was not consistent. *Id.* at 209.

Mother was also given the goal of completing a drug and alcohol evaluation, as well as follow all recommendations made by the provider, and submit to random drugs screens by the Agency. *Id.* at 191. Ms. March noted that, throughout this case, Mother has been prescribed Prodaxa, Trazadone,

and Lexapro; however, various drug screenings revealed Mother was not consistently taking her prescribed medications. *Id.* at 203-04. Mother admitted as much to Ms. March, and, sometimes, Mother "blatantly refused drug screens." *Id.* at 203. She noted Mother testified positive for alcohol on October 29, 2020, K-2 on October 27, 2020, and amphetamines on December 2, 2020. *Id.* at 205.

Additionally, Mother was given the goals of engaging in MM/IDD services, maintaining contact and cooperation with the Agency, engaging in family meetings, and discussing care planning with the Agency. Mother was unsuccessfully discharged from the MM/IDD services due to noncompliance. *Id.* at 208-09. Mother was specifically given the goal of having "productive conversations and refrain[ing] from disparaging remarks toward the Agency staff and providers[.]" *Id.* at 192. Ms. March testified Mother's cooperation with the Agency was "poor," and she made several disparaging comments to Ms. March in particular. *Id.* at 215.

She noted Mother appeared for family meetings, which occurred every three months; however, on two occasions, Mother abruptly ended the meetings, so the Agency was unable to address concerns with Mother. *Id.* Ms. March testified Mother made unfounded accusations, such as indicating Ms. March was "receiving money for taking kids from other people," and she called Ms. March "numerous foul names[.]" *Id.* at 216.

Mother was given the general goal of maintaining contact with the Child. *Id.* Ms. March noted the concurrent plans in this case were return to parent and adoption with D.A. identified as the adoptive resource. *Id.* Ms. March opined that adoption is in the Child's best interests. *Id.* at 217. She noted the Child is "thriving" in foster care and is bonded with her foster family. *Id.* She opined the Child has more of a bond with D.A. than she does with Mother. *Id.* Ms. March indicated that Mother is not able to resume custody of the Child since she has not fully alleviated the concerns that led to the Child's placement, and it is unlikely that Mother can alleviate the concerns in a reasonable time period. *Id.* She opined there would be no negative affect on the Child if Mother's parental rights were terminated. *Id.* at 218.

Mother testified at the hearing.[4] She testified she has "blood clot issues," and she knew in early August of 2020 that she needed help with the Child. N.T., 3/15/22, at 241. She testified she could not clean the house, so she asked Justice Works to help her. *Id.* at 242. She admitted she allowed the Child to live with D.A. beginning on August 5, 2020, but she anticipated she would get custody of the Child back after her surgeries. *Id.* at 244. Mother indicated she was airlifted to the hospital on August 20, 2020, to have the blood clots removed. *Id.* at 243.

---

[4] Father did not testify at the termination hearing.

Mother acknowledged the Child was deemed to be a dependent child, and she had a list of goals that she needed to complete. *Id.* at 244-45. She testified she completed her mental health evaluation in December of 2020, and her drug and alcohol evaluation in February of 2021. *Id.* at 245. Mother indicated that, as a result of her mental evaluation, she was given the diagnosis of anxiety, and she began to take prescribed medication. *Id.* at 246. She acknowledged that she suffered from depression, and, after her first visit with the Child, she was in the hospital on a "72-hour hold." *Id.* She began taking prescribed medicine for anxiety and depression. *Id.* However, Mother admitted she stopped taking the medicine because she "didn't' see the need to take it." *Id.* at 263. She testified she understands now that she must take the medicine. *Id.*

Mother testified she has a counselor at TrueNorth, Ms. Watts, and she tries to see her every two weeks. *Id.* at 248. She completed parenting classes. *Id.* Mother admitted when she went to the park she did not "run around with [the Child]," and inside, she "sat on the couch[.]" *Id.* at 249. However, she explained she takes blood thinners, and it's difficult for her to move. *Id.* at 250. Mother explained she often used Face Time during the visits with the Child because she wanted the Child to see her relatives so that they remained connected. *Id.* Mother admitted she had difficulty not "snapping" at Agency workers. *Id.*

Mother testified she has gotten a job at Giant Food Market, she makes $13.50 an hour, and she tries to work from 11:00 a.m. to 5:00 p.m. *Id.* at 251-52. Mother admitted she does not have a driver's license, so she relies on the bus. *Id.* at 253. She testified she has purchased clothes, as well as shoes for the Child, and she relied on Ms. March to provide her with the appropriate sizes. *Id.* at 255. Mother admitted she resents D.A. and believes it was her plan to take the Child away from the beginning. *Id.* at 257. Mother testified that D.A. would text "updates" about the Child, but it would make Mother "mad because she's telling me stuff that [the Child] is doing that she already had been doing. So, it wasn't really an update to me. It was just telling me old stuff." *Id.* at 258.

Mother admitted she would prevent the Agency workers from entering her home; however, she indicated she did so because she "didn't feel like [letting] them come in and nitpick everything in [her] house." *Id.* Mother testified her family lives in Florida, and she wants to move to Florida with the Child. *Id.* at 261. However, she clarified her own mother lives in Connecticut, but she has no relationship with her. *Id.*

Mother testified she misses the Child, and in retrospect, she wishes she would never have asked D.A. to get involved. *Id.* at 264. Mother blames D.A. for making the situation worse by calling the Agency. *Id.* She indicated she was "backstabbed because [she] asked for help." *Id.* She testified she has done everything, and more, that has been asked of her by the Agency.

*Id.* She noted she got her job at Giant, and she walks around a lot because she doesn't like to "sit around." *Id.* at 265.

By order entered on March 31, 2022, and as supported by an opinion with detailed factual findings, the Orphans' Court held that termination of Mother's parental rights was proper under Subsections 2511(a)(2), (5), (8), and (b). Additionally, by order entered on April 1, 2022, the Court changed the Child's permanency plan to adoption. Mother filed two separate timely notices of appeal,[5] as well as contemporaneous Pa.R.A.P. 1925(b) statements. On May 28, 2022, the Orphans' Court filed a responsive Pa.R.A.P. 1925(a) opinion.

On appeal, Mother sets forth the following issues in her "Statement of Questions Presented" (verbatim):

1. Did the trial court abuse its discretion or commit an error of law in determining that Adams County Children and Youth Services made reasonable efforts to effectuate the permanency goal of reunification with parent(s) and that the permanency goal should be changed to adoption?

2. Did the trial court abuse its discretion or commit and (*sic*) error of law in holding that Adams County Children and Youth Services proved by clear and convincing evidence that there was a repeated and continued incapacity, abuse, neglect, or refusal of the parent [that] has caused the child to be without essential parental care, control or subsistence necessary for his (*sic*) physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent? 23 Pa.C.SA. [§] 2511(a)(2)?

---

[5] We address both of Mother's appeals in the instant decision.

- 23 -

3. Did the trial court abuse its discretion or commit an error of law in holding that Adams County Children and Youth Services proved by clear and convincing evidence that the issues leading to the removal or placement of the child continued to exist, and that Appellant cannot or will not remedy the conditions that led to placement pursuant to 23 Pa.C.S.A. § 2511(a)(5) and (a)(8)?

Mother's Brief at 3-4 (suggested answers omitted).[6]

Initially, we address Mother's second and third issues, which are interrelated. Mother avers the Agency did not provide clear and convincing evidence in support of termination under 23 Pa.C.S.A. § 2511(a)(2), (5), and (8) since the evidence reveals she made substantial progress on many of her assigned goals. She specifically alleges "[t]he conditions that led to the [C]hild's removal were environmental concerns and mental health concerns. Mother has remedied both of those issues." Mother's Brief at 11.

Further, Mother suggests the Agency did not provide clear and convincing evidence that termination would be in the Child's best interests under 23 Pa.C.S.A. § 2511(b).[7] Specifically, as to Subsection 2511(b), she suggests the evidence reveals it is in the Child's best interests to not terminate Mother's parental rights since the evidence reveals the Child has suffered

---

[6] While Mother filed two separate notices of appeal, she filed a nearly identical brief for both appeals.

[7] We acknowledge Mother did not reference Subsection 2511(b) in her "Statement of Questions Presented." However, inasmuch as Mother discusses the Child's best interests in the argument portion of her brief, we find no substantial impediment to our review.

trauma while she has been in placement, and the Child has a bond with Mother. *Id.* at 9.

In matters involving the involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013).

"The [orphans'] court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the [orphans'] court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Subsection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Subsection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Subsection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quotation omitted).

In the case *sub judice*, the Orphans' Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the Orphans' Court as to any one Subsection of 2511(a), as well as Subsection 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination order pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to Subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b) (bold in original).

With regard to termination of parental rights pursuant to Subsection 2511(a)(2), we have indicated:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation

omitted). "The grounds for termination due to parental incapacity that cannot

- 27 -

be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quotation omitted). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See id.*

Instantly, in finding grounds for termination of Mother's parental rights, including pursuant to Subsection 2511(a)(2), the Orphans' Court reasoned:

> In terminating [Mother's parental] rights, the Court found clear and convincing evidence that [Mother's] repeated and continued incapacity and refusal has caused the Child to be without essential parental care, control, or subsistence necessary for her physical and mental well-being and that [Mother] cannot or will not remedy the conditions and causes of the incapacity or refusal. *See* 23 Pa.C.S.A. § 2511(a)(2).

> ***

> Instantly, the factual record reveals that [Mother's] erratic behavior and significant mental health issues placed the Child's physical and mental well-being in jeopardy since the Child's birth [in] October [of] 2017. Initially after birth, while the Child was residing with Father and [Mother], the Child was subjected to potential poisoning after sleeping pills were found mixed with her baby formula. Although [Mother] was not criminally charged in the incident…, it became the springboard to a chaotic and unstable childhood [for the Child]. Following the incident, [Mother] and the Child eventually relocated to a domestic violence shelter in Adams County. After [a] temporary stay at the domestic violence shelter, [Mother] and the Child took up residence through a homeless shelter program. At the time of [the Agency's] involvement in May of 2020, the Child had lived in at least five different locations over the 31 months of her young life.

> The record reflects that the catalysts for this erratic lifestyle was [Mother's] significant mental health issues. According to a psychological evaluation in February of 2021, [Mother's] psychological and parental functioning does not meet the minimally adequate criteria to provide safe, independent caretaking for the Child as [Mother] is diagnosed with borderline

- 28 -

personality disorder exhibiting manic and erratic function, suicidal thoughts, use of emotional leverage against others, and poor coping resources. The psychologist indicated that [Mother's] psychiatric symptoms are chronic and likely will require years of psychiatric medication, psychological counseling, trauma therapy, parenting classes, and in-home parenting services to become sufficiently stabilized for independent parenting.

The Agency's involvement with [Mother] began in May [of] 2020, when the Agency received a referral raising concerns about [Mother's] mental stability and the conditions of her home. Upon its initial involvement and prior to the psychological evaluation, the Agency offered voluntary services to [Mother]. Initially, [Mother] cooperated with services through Justice Works and attended bi-weekly therapy sessions. The significant environmental concerns at [Mother's] residence seemed to be concurrently improving. As such, the Agency case was closed without court intervention on July 15, 2020. [Shortly thereafter], the Agency received another referral concerning [Mother's] mental health and the environmental conditions at the home. Upon investigation, the Agency discovered [Mother] had discontinued her therapy and confirmed that the condition of the home had once again deteriorated. An effort to resume voluntary services proved futile. [Mother] refused to cooperate with Justice Works and was not attending therapy. An August 5, 2020, visit to [Mother's] residence revealed the situation was deteriorating. The visiting caseworker observed dirty diapers on the floor, bugs in the Child's potty chair, and a bathtub filled with dark, odorous water. Additionally, old food was observed rotting in the kitchen sink. Rather than initiate a dependency action, the Agency acceded to [Mother's] request to permit the Child to live with a family friend, [D.A.]. On August 6, 2020, [Mother] was involuntarily committed to a mental health facility. While committed, [Mother] apparently concluded that the Agency and/or [D.A.] was responsible for her commitment. [Mother] threatened to take the Child and flee Pennsylvania. Additionally, [Mother] threatened both an Agency caseworker and [D.A.]. On August 6, 2020, the Agency requested, and was granted, emergency custody of the Child; however, the Child remained with [D.A.] in a [foster] placement. The Child was ultimately adjudicated dependent on September 24, 2020.

The diagnosis and prognosis of [Mother's] psychological evaluation has since been corroborated. During the approximately 16-month period between adjudication and the

- 29 -

Agency's filing of the termination petition, the depth of [Mother's] mental health issues and incapacity to parent became obvious. [Mother] consistently resisted services, and, even after relenting, [she] was sporadic in her attendance. [A]fter being cautioned as to a likely discharge for failure to attend nurturing parent program classes, [Mother] participated in [the classes] but was unable to substantively grasp any of the instruction. Additionally, it took over a year for [Mother] to obtain a drug and alcohol evaluation[, which was necessary to address the concerns about Mother's prescription misuse and/or failure to medicate properly as directed by her mental health professional]. Similarly, approximately six months had passed before [Mother] submitted to a psychological evaluation[.] Despite a recommendation for intensive treatment by a psychologist, [Mother] only participated in an average of only one treatment session per month. Critically, [Mother's] compliance with prescribed medication [for her mental issues] was inconsistent.

[Mother's] failure to embrace treatment had significant negative impact on her condition. Family meetings were regularly terminated early because of [Mother's] aggression. She was consistently hostile to Agency staff and threatened [D.A.], the Child's [foster] provider, on several occasions. This condition persisted despite the [Orphans'] Court admonishing [Mother] to cease such behavior. [Mother's] paranoid ideation exhibited itself as she accused the Agency caseworker and [foster] provider of being longtime friends who were conspiring against her. [In fact, the caseworker and [D.A.] did not know each other prior to the instant matter.] [Mother] refused to let the Agency inspect her home with [regularity, and when the Agency did so,] the caseworker observed trash in the interior of the residence, bugs in the kitchen, and a foul odor throughout the residence. Despite services being provided by the Agency, [Mother] was unable to grasp or apply parenting concepts.

Unfortunately, [Mother's] behavior caused significant harm to the Child. Following visits with [Mother], the Child pulled out her hair and often threw tantrums.

\*\*\*

The [Orphans'] Court's acceptance of the testimony of [Mother's] evaluating psychologist is, in and of itself, sufficient clear and convincing evidence that [Mother's] incapacity and refusal to embrace meaningful [mental health] treatment has caused the Child to be without essential parental care, control,

and subsistence necessary for her physical and mental well-being. As indicated by the psychologist, [Mother's] psychiatric symptoms are chronic and likely will require years of psychiatric medication, psychological counseling, and other treatment in order for [Mother] to become sufficiently stabilized for independent parenting. [Mother's] inability and/or refusal to actively embrace such [mental health] treatment presents a significant impediment to timely permanency for the Child. The psychologist's testimony, moreover, has overwhelming support in the record and is corroborated by the testimony of Agency caseworkers, visitation specialists, treatment providers, the Child's trauma art therapist, as well as [Mother's] own actions during the pendency of this litigation.

[Thus,] [Mother's] conduct warrants termination of her parental rights[.]

Orphans' Court Opinion, filed 5/28/22, at 1-7 (footnotes omitted).

We find no abuse of discretion or error of law. *In re T.S.M.*, *supra*. The record reflects Mother has continuously demonstrated a refusal or incapacity to address her mental health issues, which has resulted in her inability to provide a clean environment for the Child, control her hostility, and apply parenting skills. Despite being given assistance by the Agency, Mother cannot or will not remedy these issues. *In re Adoption of M.E.P.*, *supra*. The Agency proved by clear and convincing evidence that Mother's refusal has caused the Child to be without essential parental care, control, or subsistence necessary for her well-being. *Id.*

Accordingly, we conclude the Orphans' Court did not abuse its discretion in ordering termination under Subsection 2511(a)(2). As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court

cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

As noted above, in order to affirm a termination of parental rights, we need only agree with the Orphans' Court as to any one Subsection of 2511(a) before assessing the determination under Subsection 2511(b), and we, therefore, need not address any further Subsections of 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Subsection 2511(b). As to Subsection 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In *In re E.M*, [533 Pa. 115, 620 A.2d 481, 485 (1993)], th[e] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267 (quotation and citation omitted).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular

- 32 -

case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Subsection 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the Subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the [orphans'] court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent....

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quotation marks and quotations omitted).

In determining that termination of Mother's parental rights favors the Child's needs and welfare under Subsection 2511(b), the Orphans' Court indicated:

At the termination hearing, numerous witnesses indicated the lack of existence of any bond between [Mother] and the Child. This testimony was supported by the [Orphans'] Court's own observations in the courtroom since, during hearings, neither [Mother] nor the Child displayed any affection for each other. Indeed, [Mother's] lack of emotional affect was chilling. In non-court settings, the witnesses' testimony confirmed that [Mother's]

primary emotional response was anger with others rather than an affectionate bond with the Child. Agency caseworkers and [an] art trauma therapist both credibly opined that not only was a bond nonexistent but also contact between [Mother] and the Child was detrimental to the Child's well-being. This testimony was corroborated by the [foster] provider's physical observations.

On the other hand, the Child has formed a significant bond with the [foster] family. For the 16-month period prior to the termination hearing, the [foster] family was the Child's sole emotional and financial support. Indeed, the Child's time with the [foster] family has proven to be the most stable of her young life. The [foster] home is willing to provide permanency and clearly has developed a healthy relationship with the Child. It is the [foster] family, rather than [Mother], who has solely provided love, comfort, security, and stability to the Child and is firmly committed to doing so into the future. Unquestionably, the Child's best interests are served by termination of [Mother's] parental rights.

Orphans' Court Opinion, filed 5/28/22, at 7-8.

We conclude the Orphans' Court did not abuse its discretion in finding the Child's developmental, physical, and emotional needs and welfare favor termination of parental rights pursuant to Subsection 2511(b). *See In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267. The Agency presented ample evidence that the Child's daily needs are being met adequately by her foster family, she seeks comfort from them, and she refers to the foster mother as "mommy" and her foster father as "daddy."

To the extent Mother suggests the record reveals the Child has suffered trauma while she has been in placement, and thus, it is not in the Child's best interests to terminate Mother's parental rights, we conclude the Orphans' Court properly rejected Mother's claim. As the Orphans' Court determined,

any trauma the Child has suffered was in relation to the fact she was required to visit Mother. The Orphans' Court discussed at length the stress the Child suffered on visitation days with Mother, and the Court noted that the time the Child has spent with the foster family has been the "most stable of her young life." Orphans' Court Opinion, filed 5/28/22, at 8. We find no abuse of discretion or error of law in this regard. *In re T.S.M.*, *supra*.

Moreover, to the extent Mother suggests the Orphans' Court did not adequately consider Mother's bond with the Child, we disagree. The Orphans' Court considered in depth the issue of whether a bond existed and concluded there was no bond between Mother and the Child. The evidence supports the Orphans' Court's holding. We find no abuse of discretion or error of law. *Id.*

While Mother may profess to love the Child, a parent's own feelings of love and affection for her child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. The Child is entitled to permanency and stability. *See id.* "[A] parent's basic constitutional right to the custody and rearing of [her] child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude the Orphans' Court properly terminated Mother's

parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b) as to the Child. Thus, we affirm the Orphans' Court's termination order.

Next, Mother argues the Court abused its discretion in changing the goal of the dependency proceedings to adoption. Because we have concluded that the Orphans' Court did not abuse its discretion in granting the petition to terminate Mother's parental rights, this issue is moot. ***In re Adoption of A.H.***, 247 A.3d 439, 446 (Pa.Super. 2021) ("[T]he effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change the child's goal to adoption.") (citing ***Interest of D.R.−W.***, 227 A.3d 905, 917 (Pa.Super. 2020)).

For all of the foregoing reasons, we affirm the order terminating Mother's parental rights to the Child, as well as the order changing the permanency goal to adoption.

Affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/25/2022